**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JAMES T. AINSWORTH, et al.<br>        Plaintiffs,<br><br>        v.<br><br>AMICA MUTUAL INS. CO.<br>        Defendant. | No. 3:16-cv-01139 (MPS) |

**RULING ON MOTION TO DISMISS**

## I.      Introduction

Plaintiffs James T. Ainsworth and Nancy H. Ainsworth filed this action in state court against their homeowner's insurance provider, Amica Mutual Insurance Company ("Amica"), for failure to pay for damages to their basement walls caused by cracking and deterioration in the concrete. Amica removed the case to this court on July 7, 2016. (ECF No. 1.) On September 11, 2017, the plaintiffs filed a second amended complaint, bringing the following claims: (i) breach of contract (count one); (ii) declaratory judgment concerning the coverage of the plaintiffs' home (count two); (iii) breach of the implied covenant of good faith and fair dealing (count three); and (iv) violation of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a–816 *et seq.* ("CUIPA") and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42–110a *et seq.* ("CUTPA") (count four). (ECF No. 43 ("Complaint") at ¶¶ 8-84.) Now before me is the defendants' motion to dismiss, which chiefly contends that the plaintiffs' claims fail because the homeowner's insurance policy for their property unambiguously does not cover the losses they assert. (ECF No. 46.) For the reasons set forth below, this motion is granted in part and denied in part. It is granted with respect to the plaintiffs' breach of the implied covenant

of good faith and fair dealing claim (count three) and declaratory judgment claim (count two). It is denied with respect to the plaintiffs' other claims.

## II. Factual Allegations and Pertinent Policy Language

### A. Plaintiff's Factual Allegations

Plaintiff makes the following factual allegations, which I assume to be true.

The plaintiffs purchased their home in 1997 and insured it since that time "with a homeowner's policy issued by [Amica]." (Complaint at ¶¶ 5-6.) The "plaintiffs have paid the premium charged by [Amica] each year and, without further action on the plaintiffs' part, the subject policy was automatically renewed by [Amica] subject to the payment of the related premiums, all of which were timely and satisfactorily paid." (*Id.* at ¶ 7.)

"In 2012, the plaintiffs noticed that the basement walls of their home had a series of horizontal and vertical cracks throughout." (*Id.* at ¶ 9.) The plaintiffs subsequently hired a local engineer to look into the problem. (*Id.* at ¶ 10.) The engineer "suggested that the problems [the plaintiffs] were experiencing were due to defective concrete used in the construction of the basement walls of their home." (*Id.* at ¶ 11.) He was of the opinion, however, "that [the plaintiffs] had discovered the condition in their walls early enough to prevent further deterioration and salvage the concrete basement walls by designing an interior support wall system constructed with properly batched concrete and abutting the existing basement walls of their home." (*Id.* at ¶ 12.) Relying upon this recommendation, the "plaintiffs installed the interior support wall system designed by their engineer in spring of 2013 and were thereafter under the impression that the problems with the original basement walls were resolved and that the home had, at all times, remained structurally sound." (*Id.* at ¶ 13.)

In the late summer and early fall of 2015, however, "the plaintiffs saw local news coverage which now suggested that the cause of the deterioration of the original basement walls of their home was a chemical compound found in certain basement walls constructed between the mid-1980s and the late 1990s with concrete most likely from the J.J. Mottes Concrete Company." (*Id.* at ¶ 14.) "In particular, the aggregate used by the J.J. Mottes Concrete Company in manufacturing the concrete in that particular time period contained a chemical compound which, with its mixture with the water, sand and cement necessary to form the concrete, began to oxidize (rust) and expand, breaking the bonds of the concrete internally and reducing it to rubble." (*Id.* at ¶ 15.) The plaintiffs learned from local news coverage in the late summer and fall of 2015 that, "contrary to the suggestion of the engineer that they had hired earlier, there is no known scientific or engineering method or process which is effective in stopping or reversing the deterioration." (*Id.* at ¶ 16.)

"Having seen the news coverage, the plaintiffs inspected the new walls poured within their home and discovered that, despite being constructed with good and sufficient concrete, the new walls had begun to display the pattern of cracking associated with Mottes concrete suggesting that the continued expansion of the original walls had begun to adversely impact the new walls constructed in 2013." (*Id.* at ¶ 17.) "At some point between the date on which the original basement walls were poured and the month of July, 2015, the basement walls suffered a substantial impairment to their structural integrity, which substantial impairment was not cured or otherwise corrected by the installation of the interior basement walls." (*Id.* at ¶ 18.) "It is only a question of time until the basement balls of the plaintiffs' home will fall in due to the exterior pressure of the surrounding soil," causing "the entire home [to] fall into the basement." (*Id.* at ¶¶ 19-20.)

Upon realizing the extent of the damage to their home, the plaintiffs filed a claim with Amica on September 29, 2015.  (*Id.* at ¶¶ 37-38.)  Amica "denied coverage by way of a letter dated December 16, 2016, claiming that the homeowner's policies issued by the defendant do not afford coverage for the condition affecting their basement walls."  (*Id.* at ¶ 39.)  The plaintiffs allege that Amica "breached its contractual obligation" under the policy by refusing to provide coverage for their claim.  (*Id.* at ¶¶ 40-43.)

The plaintiffs also assert that "[a]t some point in the early to middle 2000s, perhaps earlier, [Amica] became aware of the fact that a number of homes it insured in the northeast corner of Connecticut, principally in Tolland County—which is well within the business service of J.J. Mottes Concrete—and which were constructed between the mid-1980s and late 1990s were highly likely to have basement walls constructed with the defective concrete [noted above]."  (*Id.* at ¶ 56.)  Amica knew that these homes would show telltale signs of cracking in the near future and that, "unless repaired, all of the homes constructed between the mid-1980s and late 1990s with the defective concrete would eventually collapse once the concrete disintegrated to the point where it could no longer support the weight of the structure above or oppose the lateral pressure of the earth against the basement walls or both."  (*Id.* at ¶¶ 57-58.)  "Armed with this knowledge, the defendant made a change to the Additional Coverages section of its homeowner's policies to avoid liability for the potential claims of the plaintiffs' and other similarly situated insureds in northeastern Connecticut which it well knew either existed but was undiscovered or would arise upon the passage of time."  (*Id.* at ¶ 59.)  Amica "also knew, or should have known, that the structural integrity of all of the basement walls within the homes constructed between the mid-1980s and late 1990s with the defective concrete had become substantially impaired prior to the defendant's attempts to alter the Additional Coverages section

of its homeowner's policies." (*Id.* at ¶ 60.)  Despite this knowledge, Amica made no attempt to explain or disclose to its insureds the reasons for the changes to its homeowner's policies.  (*Id.*at ¶¶ 61-62.)

Further, Amica "participates in the Insurance Services Office, Inc. ('ISO') which is a cooperative organization formed and controlled by its participants for the purpose, among others, of collecting data on the type of claims made, the policy provisions cited for the basis of each claim, the geographic areas in which the claimed damage has occurred, and the actions taken by insurers in response to such claims."  (*Id.* at ¶ 71.)  The plaintiffs allege that, through participation in the ISO, Amica had knowledge of many claims in northeastern Connecticut resulting from similar concrete decay, the strategies other insurers had used to deny such claims, and cases such as *Bacewicz v. NGM Ins. Co.*, No. 3:08-CV-1530 (JCH), in which claimants were awarded judgment against an insurer for concrete decay based on "nearly identical" policy language. (*Id.* at ¶¶ 74-76.) The plaintiffs allege that in its denial letter Amica "gave the insured a knowingly false and misleading reason for the denial of coverage." (*Id.* at ¶ 77.)  Further, the Plaintiffs allege that Amica is "regularly . . . engaged" in refusing to resolve concrete decay claims in good faith, citing seven similar cases in Connecticut Superior Court in which Amica is a defendant.  (*Id.* at ¶¶ 80-81.)

## B.  The Relevant Language of the Homeowners Policies

Amica has attached to its motion to dismiss the plaintiffs' homeowner's policies during the relevant time period.  Since the plaintiffs had actual notice of these documents, rely upon them in framing their complaint, and do not contest their validity in their objection, I rely upon these documents in adjudicating Amica's motion to dismiss.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Where plaintiff has actual notice of all the

information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."). The plaintiffs' homeowner's policies' coverage of collapse changed several times during the pertinent time period. I list the relevant versions of the policies below.

### 1. Pre-2007 Policies

The plaintiffs' homeowner's policies with Amica before 2007 contained the following coverage for collapse:

**ADDITIONAL COVERAGES**

. . .

**8. Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

. . .

**b.** Hidden decay;

. . .

**f.** Use of defective material or methods in construction, remodeling or renovation . . . .

Loss to a[] . . . foundation [or] retaining wall . . . is not included under items **b.** [. . .] and **f.** unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging, or expansion.

. . .

**SECTION I – PERILS INSURED AGAINST**

. . .

We insure against risks of direct physical loss to property described in Coverages A and B . . . . We do not insure, however, for loss:

**1.** Involving collapse, other than as provided in Additional Coverage 8;

(ECF No. 46-12, Exhibit 12 ("Pre-2007 Policies") at 14, 16, 17, 30.)

## 2. 2007-2012 Policies

The plaintiffs' homeowner's policies with Amica from 2007-2012 contained the following coverage for collapse:

**E.** **Additional Coverages**

. . .

**8.** **Collapse**

. . .

    **b.**     With respect to this Additional Coverage:

        **(1)** Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

        **(2)** A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

        **(3)** A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

        **(4)** A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(ECF No. 46-7 at 25 (2007-2008 policy); ECF No. 46-8 at 27 (2008-2009 policy); ECF No. 46-9 at 21 (2009-2010 policy); ECF No. 46-10 at 14 (2010-2011 policy); ECF No. 46-11 at 15 (2011-2012 policy).)

## 3. 2012-2016 Policies

The plaintiffs' homeowner's policies with Amica from 2012-2016 contained the following coverage for collapse:

**E.** **Additional Coverages**
. . .

        **8.** **Collapse** . . .

. . .

            **b.** The coverage provided under this Additional Coverage—Collapse applies only to an abrupt collapse.

            **c.** For the purpose of this Additional Coverage—Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

            **d.** This Additional Coverage—Collapse does not apply to:

                **(1)** A building or any part of a building that is in danger of falling down or caving in;

                **(2)** A part of a building that is standing, even if it has separated from another part of the building; or

                **(3)** A building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

            **e.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

                **(1)** The Perils Insured Against;

                **(2)** Decay, of a building or any part of a building, that is hidden from view, unless the presence of such decay is known to an **insured** prior to collapse;

                **(3)** Insect or vermin damage, to a building or any part of a building that is hidden from view, unless the

presence of such damage is known to an insured prior to collapse

**(4)** Weight of contents, equipment, animals or people;

**(5)** Weight of rain which collects on a roof; or

**(6)** Use of defective materials or methods in construction, remodeling or renovation.

(ECF No. 46-3 at 51 (2012-2013 policy); ECF No. 46-4 at 22 (2013-2014 policy); ECF No. 46-5 at 21 (2014-2015 policy); ECF No. 46-6 at 20 (2015-2016 policy).)

## III.     Legal Standard

Under Fed. R. Civ. P. 12(b)(6), the Court must determine whether plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ray v. Watnick*, 688 F. App'x 41 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted)). While the Court must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008), it must grant the moving party's motion if "a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims. . . ." *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004).

## IV.     Discussion

### A.  Suit Against Us Provision

Amica alleges that the plaintiffs' suit is time barred due to a provision in the policies specifying the time period in which a suit may be brought. (ECF No. 46 at 17-18.) The clause in question provides as follows:

> **8.**     **Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

(ECF No. 46 at 16.) Amica contends that the plaintiffs' potential claims were time barred a year after their discovery of the damage to their home in September of 2012. (ECF No. 45-46.)

"The Connecticut Supreme Court has long held that a contractual condition in an insurance policy requiring an action to be brought within a particular time period is . . . valid and binding upon the parties." *Roberts v. Amica Mut. Ins. Co.*, No. 3:14-CV-1589 (SRU), 2015 WL 7458510, at *3 (D. Conn. Nov. 24, 2015). The contractual suit limitation "does not operate as a statute of limitations," however, and the "interpretation of a contractual suit limitation is [therefore] governed by Connecticut contract law, not statutory law." *Id.* (internal quotation marks and citations omitted). The parties agree that the "discovery rule" standard utilized by the First Circuit in *Parker v. Worcester Ins. Co.*, 247 F.3d 1 (1st Cir. 2001) controls this issue. (*See* ECF No. 46 at 18-19 (citing *Parker*); ECF No. 47 at 7-8 (same).); *see also Roberts v. Amica Mut. Ins. Co.*, No. 3:14-CV-1589 (SRU), 2015 WL 7458510, at *3 (D. Conn. Nov. 24, 2015) (citing *Parker* in interpreting suit against us provision); *Bacewicz v. NGM Ins. Co.*, No. 3:08-CV-1530 (JCH), 2010 WL 3023882, at *7 (D. Conn. Aug. 2, 2010) (same). In *Parker*, the First Circuit predicted that the Connecticut Supreme Court would hold that the limitations period under a suit against us provision begins to run when a party "learned or should have learned" of a loss covered under the policy. *Parker*, 247 F.3d at 5. Thus, the relevant inquiry here is when the plaintiffs learned or should have learned of the losses they later claimed under their homeowner's policy.

I conclude that that time period, based upon the allegations of the complaint, was the late summer and early fall of 2015.  To be sure, Amica is correct that the plaintiffs allege in their complaint that they first discovered the cracking in 2012.  The plaintiffs also contend, however, that they were informed by an engineer during that time period that the cracks could be fixed through the installation of a support system.  (Complaint at ¶¶ 12-13.)  They assert that they only learned the true extent of the damage to their home in the late summer and fall of 2015.  (Complaint at ¶ 16.)  Based upon these allegations and drawing all inferences in the plaintiffs' favor, they have alleged that they only knew or should have known of the loss to their property they claimed under their homeowner's insurance policy in the late summer and fall of 2015.

The *Parker* decision is instructive on this point.  *Parker* concerned a similar factual scenario to the present case—a suit against an insurance company for refusal to honor a claim for damage to a property caused by cracking concrete.  *Parker* 247 F.3d at 2.  The plaintiffs had moved into a new house in Connecticut in 1985 and had immediately noticed "hairline, mostly horizontal cracks in the concrete walls of the basement."  *Id.*  The plaintiffs initially wrote off the cracks as "cosmetic," but in 1996 "noticed that the cracks were growing larger and that the basement wall seemed to be developing a sandy texture, as if it were disintegrating."  *Id.*  The plaintiffs filed a claim with their insurance company shortly thereafter, but the claim was denied.  *Id.* at 3.  In June 1997, the plaintiffs arranged for an engineer to inspect the premises; the engineer informed them that the house was no longer safe.  *Id.* at 3.  The plaintiffs filed suit against the insurer in February 1998.  *Id.*  The insurance policy at issue provided that "[n]o action can be brought [against the insurer] unless . . . the action is started within one year after the date of loss."  *Id.* at 4.  The insurance company argued that this provision barred the plaintiffs' suit because the plaintiffs knew that some sort of appreciable damage had occurred to

their home by mid-1996.  *Id.* at 4.  The *Parker* court concluded, however, that the limitations period did not begin until the plaintiffs knew or should have known that damage had occurred to the property that triggered the plaintiffs' insurance coverage for collapse.  *Id.* at 5.  The *Parker* court concluded there was a genuine dispute of material fact on this issue given that the plaintiffs had received the expert report predicting the collapse of their home in mid-1997.  *Id.*

A similar analysis applies here.  Although the plaintiffs first learned of the damage to their home in 2012, their allegations do not suggest that they knew or should have known such damage would be covered under their homeowner's insurance policies at that time.  Rather, the complaint suggests that they believed—based upon the recommendation provided to them by the engineer in 2012—that the concrete used to form their basement walls had defects within it that caused cracking, but that the problem was manageable, could be fixed, and did not make their house structurally unsound.  (Complaint at ¶¶ 12-13.)  The complaint does not allege any facts suggesting that the plaintiffs knew or should have known at that time that the cracking in their basement walls presented a threat to the long-term stability of their house.  Further, the homeowner's insurance policy in effect at the time noted in its collapse coverage that "Collapse does not apply to . . . [a] building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." (ECF No. 46-3 at 31 (2012-2013 policy).)  Drawing all reasonable inferences in the plaintiff's favor, I conclude that the complaint alleges that the plaintiffs had no reason to believe the damage to their home was substantial and thus would have little reason to believe such losses would be covered under their homeowner's insurance policy.

For these reasons, I reject Amica's contention that the plaintiffs' suit is time barred.

### B.  Breach of Contract (Count One)

Because the pertinent language of the plaintiffs' homeowner's policies changed over the nearly two decades since the plaintiffs began insuring their home with Amica, it is necessary to inquire as to which policy or policies apply to the loss alleged in the amended complaint. The plaintiffs do not explicitly allege which of the policies govern(s) the alleged loss. They do allege, however, that their home was built in 1985, that they have insured their home "with a homeowner's insurance policy issued by the defendant at all times since they purchased the home" in 1997, and that, "[a]t some point between the date on which the basement walls were poured and the month of July 2015, the basement walls suffered a substantial impairment to their structural integrity." (Complaint at ¶ 18.) When reasonable inferences are drawn in the plaintiffs' favor, these allegations suggest that the alleged loss could have arisen under any one or more of Amica's policies, including the pre-2007 policies which do not define the term, "collapse."[1] *See Roberge v. Amica Mut. Ins. Co.*, No. 3:15CV1262 (WWE), 2015 WL 9480008, at *3 (D. Conn. Dec. 29, 2015) (concluding, in rejecting insurer's motion to dismiss, that plaintiffs had stated plausible claim that cracking in their basement walls resulting from defective concrete could have occurred prior to a 2006 amendment changing the collapse coverage in their homeowner's insurance policy). Therefore, Amica must show that it is entitled

---

[1] While Amica contends that the plaintiffs have failed to allege facts demonstrating that the damage to their property occurred when it insured the property (*see* ECF No. 46 at 34-35 (noting that the plaintiffs' allegations suggest the damage to their property could have occurred before Amica insured the plaintiffs' home)), such an argument would require me to draw an inference *against* the plaintiffs in defiance of Second Circuit precedent. *See Vietnam Ass'n for Victims of Agent Orange*, 517 F.3d at 115 (noting courts must "draw all reasonable inferences in favor of the non-moving party" in the context of a motion to dismiss).

to dismissal of the amended complaint under all of the policies.  For the following reasons, I

conclude that Amica has failed to meet this burden with respect to the pre-2007 policies.[2]

The parties agree that the plaintiffs' claims for collapse coverage under the pre-2007

policies are governed by the Connecticut Supreme Court's decision in *Beach v. Middlesex*

*Mutual Assurance Co.*, 205 Conn. 246, 252 (1987) (concluding that the term "collapse," when

undefined in an insurance policy, means a "substantial impairment in the structural integrity of a

building").  (*See* ECF No. 46 at 32 (averring that the *Beach* definition of "collapse" applies to the

pre-2007 policies); ECF No. 47 at 10 (same).)  The plaintiffs have presented a plausible claim

that the cracking concrete in their basement walls constitutes a substantial impairment to the

structural integrity of their home and therefore a "collapse" under the pre-2007 policies.  They

allege that the cracking concrete makes it only a matter "of time until the basement walls of

[their] home will fall in due to the exterior pressure from the surrounding soil," and that, at that

point, the  "entire home will fall into the basement."  (Complaint at ¶¶ 19-20.)  Such allegations

state a plausible claim of substantial impairment of the structural integrity of the plaintiffs'

home.  *See Belz v. Peerless Ins. Co.*, 204 F. Supp. 3d 457, 464 (D. Conn. 2016), *reconsideration*

*denied*, No. 3:13-CV-01315 (VAB), 2016 WL 6542828 (D. Conn. Nov. 3, 2016) (concluding

that damage to plaintiffs' property consisting of cracking concrete in foundation walls that would

eventually result in collapse of home into basement could constitute "substantial impairment of

structural integrity"); *Metsack v. Liberty Mut. Fire Ins. Co.*, No. 3:14-CV-01150 (VLB), 2017

WL 706599, at *6 (D. Conn. Feb. 21, 2017) (same).  Amica contends that the plaintiffs'

allegations are too conclusory to satisfy the *Beach* definition of collapse and constitute mere

_____

[2]  And, as discussed below, because I conclude that plaintiffs have alleged a plausible
breach of contract claim under the pre-2007 policies, I need not decide whether they have done
so under the post-2007 policies.

"predictions about the future."  (ECF No. 46 at 33.)  The plaintiffs are not required, however, to present details of the exact timing and nature of the potential collapse of their home in response to a motion to dismiss.[3]

For these reasons, I conclude the plaintiffs have alleged a plausible breach of contract claim.

## C.  Declaratory Judgment Claim (Count Two)

Amica moves to dismiss the plaintiffs' declaratory judgment claim on the basis that it seeks relief entirely duplicative of the relief sought in the plaintiffs' breach of contract claim. (ECF No. 46 at 34.)  I agree.  The plaintiffs' declaratory judgment claim does not seek any relief independent from their breach of contract claim.  (*Compare* Complaint at ¶ 45 (breach of contract claim seeking damages for Amica's denial of coverage) *with* Complaint at ¶¶ 49-51 (declaratory judgment claim seeking declaration that Amica wrongly denied plaintiffs' claim for coverage).)  Indeed, the plaintiffs concede as much in their objection to Amica's motion to dismiss.  (*See* ECF No. 47 at 4 n. 1 ("The Ainsworths do not disagree with the notion that the claim for breach of contract and declaratory judgment overlap and offer the same substantive relief.").  As such, I grant Amica's motion to dismiss the plaintiffs' declaratory judgment claim. *See Burgeson v. Downing*, No. 3:06CV1663WWEHBF, 2009 WL 185593, at *1 (D. Conn. Jan.

---

[3]  It is also worth noting that Chief Judge Stefan R. Underhill and Judge Robert N. Chatigny recently certified the following question to the Connecticut Supreme Court: "What constitutes a 'substantial impairment of structural integrity' for purposes of applying the 'collapse' provision of [the homeowners' insurance policy at issue in the case]?"  *See Karas v. Liberty Ins. Corp.*, No. 3:13-CV-01836 (SRU), 2018 WL 2002480, at *5 (D. Conn. Apr. 30, 2018); *Vera v. Liberty Mut. Fire Ins. Co.*, No. 3:16-CV-72 (RNC), 2018 WL 3014112, at *5 (D. Conn. June 15, 2018).  While I conclude that the plaintiffs have alleged a plausible claim under the pre-2007 policies under the current *Beach* definition of "collapse," the Connecticut Supreme Court's answer to these questions may shed further light on whether the cracking of which the plaintiffs complain constitutes a "substantial impairment" of the "structural integrity" of their home.

22, 2009) ("If plaintiff were to prevail on his claims for damages, the Court necessarily would have determined that plaintiff's rights were violated. A declaration to that effect adds nothing to the case. Accordingly, all claims for declaratory relief will be denied."); *In re Methyl Tertiary Butyl Ether (MTBE) Prod.*, 457 F. Supp. 2d 455, 466 (S.D.N.Y. 2006) ("Declaratory relief is generally inappropriate where duplicative of other claims in the action . . . . Accordingly, defendants' motion to dismiss plaintiff's claims for declaratory relief is granted.").

### D. Breach of the Covenant of Good Faith and Fair Dealing Claim (Count Three)

Amica claims that the plaintiffs' breach of the covenant of good faith and fair dealing claim fails as a matter of law. (*See* ECF No. 46 at 35; ECF No. 41-1 at 32.) "[T]he duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship." *Nwachukwu v. Liberty Bank*, 257 F. Supp. 3d 280, 295 (D. Conn. 2017) (quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432 (2004)). This duty "requir[es] that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Id.* To set out "a cognizable claim of breach of the implied covenant of good faith and fair dealing, [the plaintiff must allege that] 'the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract [were] taken in bad faith.'" *Calhoun v. Providence Mut. Fire Ins. Co.*, 204 F. Supp. 3d 436, 442 (D. Conn. 2016) (quoting *De La Concha of Hartford, Inc.*, 269 Conn. at 433). Bad faith encompasses "both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Habetz v. Condon*, 224 Conn. 231, 237 (1992), quoting Black's Law dictionary (5th ed. 1979). In essence, then, "[bad] faith means more than mere negligence, it involves a dishonest purpose." *De La*

*Concha of Hartford, Inc.*, 269 Conn. at 433. Although an insurer's "failure to conduct an adequate investigation of a claim, when accompanied by other evidence, reflecting an improper motive, properly may be considered as evidence of bad faith," *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 116 (D. Conn. 2014), "[a]llegations of a mere coverage dispute or negligence by an insurer in conducting an investigation will not state a claim for bad faith against an insurer." *Martin v. American Equity Ins. Co.*, 185 F. Supp. 2d 162, 165 (D. Conn. 2002).

Amica makes two arguments against plaintiffs' breach of the covenant of good faith and fair dealing claim. First, it contends that this claim fails along with the plaintiffs' claim for breach of contract. (*See* ECF No. 46 at 35.) This argument fails given my ruling on the plaintiffs' breach of contract claim. The second argument is more persuasive. As noted above, the plaintiffs' breach of the implied covenant of good faith and fair dealing claim is predicated on the contention that Amica surreptitiously changed the language of its post-2007 policies in anticipation of claims like the one filed by the plaintiffs concerning cracking concrete. (*See* Complaint at ¶¶ 52-67.) These allegations are contradicted by the language of the 2007-2008 policy, which contains a document entitled "**IMPORTANT NOTICE TO POLICYHOLDERS**" stating as follows:

> **REDUCED COVERAGE**
>
> <u>Collapse</u> – Many courts have interpreted collapse coverage to apply when a structure is, or is likely to be, in imminent danger of collapse because of loss to its structural integrity. Since these decisions are contrary to the long-standing intent of Collapse coverage, the definition and terms have been revised to more explicitly express intent. Additionally, language has been added to convey that hidden decay and hidden insect or vermin damage do not include decay and/or insect or vermin damage which the insured is aware of prior to collapse.

(ECF No. 46-7 at 8.)  The plaintiffs do not contest that they received this notice in their opposition to Amica's motion.  Given this notice, the plaintiffs' claim in their opposition that Amica did "not particularly identify the amendment" rings hollow.  (ECF No. 47 at 21.)

In any event, the Connecticut Supreme Court has held that "no claim for breach of the duty of good faith and fair dealing will lie for conduct occurring prior to, or during, the formation of a contract."  *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 638 (2002).  When this holding is combined with the Appellate Court of Connecticut's ruling that "a renewal of the original [insurance] policy is a separate and distinct contract providing coverage for a specific term or period," *Kane v. American Ins. Co.*, 52 Conn. App. 497, 501 (1999), it forecloses the plaintiffs' claim—which relates directly to conduct that occurred during their renewal of their homeowner's insurance policy.  At least one Connecticut Superior Court case has concluded that the combination of *Macomber* and *Kane* forecloses breach of the covenant of good faith and fair dealing claims predicated upon renewals of insurance policies.  *See Richard E. Musgrave, et al. v. State Farm Fire and Cas. Co., et al.*, TTD-CV-15-6009840-S (Conn.Super. J.D. Tolland, August 10, 2017) (unreported ruling attached to Plaintiffs' Brief, ECF No. 47-4) (Cobb, J.) ("The undisputed material facts establish that the plaintiff's claim here applies to the formation of the annual renewal policies and the amendments to policies and not to the defendant's performance of the policies, and therefore [the defendant] is entitled to summary judgment on [the plaintiff's breach of the covenant of good faith and fair dealing claim].").

Judge Hall's recent decision in the case of *Clark v. Amica Mut. Ins. Co.*, No. 3:16CV1573 (JBA), 2018 WL 2725441 (D. Conn. June 6, 2018) is instructive on this point.  In *Clark*, Judge Hall analyzed an identical argument—i.e., a breach of the covenant of good faith and fair dealing claim predicated on an insurer's alleged failure to provide adequate notice to the

plaintiff of a change to the definition of "collapse" in a homeowner's insurance policy. *Id.* at 5.

The insurer had provided the same notice to the plaintiff, however, as was provided in this case.

*Id.* Judge Hall granted the insurer's motion to dismiss the plaintiff's claim chiefly based upon

the insurer's "clear notice to insureds, including Plaintiff, that there had been changes made to

the coverage for a collapse and that such changes were made in response to courts'

interpretations of what constitutes a collapse." *Id.* at *6. She also concluded that the

Connecticut Supreme Court's decision in *Macomber* barred the plaintiff's claim in any event. *Id.*

I therefore grant Amica's motion to dismiss the plaintiffs' breach of the covenant of good

faith and fair dealing claim.[4]

### E. CUTPA Claim (Count Four)

Amica also moves to dismiss the plaintiffs' CUTPA claim. (*See* ECF No. 46 at 35-36.)

"A plaintiff may assert a private cause of action based on a substantive violation of CUIPA

through CUTPA's enforcement provision." *Karas*, 33 F. Supp. 3d at 117. The CUIPA provision

---

[4] The plaintiffs cite several cases that they contend merit a different conclusion. None of them are apposite. The plaintiffs cite two one-page Connecticut Superior Court cases summarily denying a motion to strike breach of good faith and fair dealing claims based on similar allegations to the ones advanced by the plaintiff. (*See* ECF No. 47-2 at 2 (*Mark A. Cote, et al. v. Travelers Indem. Co. of America*, Docket No. TTD-CV-15-6008838-S (Conn.Super. 2015)(Cobb, J.)); ECF No. 47-3 at 2 (*Lynn M. Green v. Patrons Mutual Ins. Co. of Conn.*, TTD-CV-15-6009661-S Case 3:16-cv-01139-MPS Document 47 Filed 10/16/17 Page 22 of 30 - 23 - (Conn.Super. 2016)(Cobb, J.)).) Neither of these cases, however, appears to involve a situation where an insurer issued a notice along the lines of the one issued by Amica in this case. At the very least, neither of the cases mentions such a notice. As such, their logic is unpersuasive here. Finally, the plaintiffs cite another Connecticut Superior Court case holding that a bad faith claim may lie where it concerns a "defendant's conduct of misrepresentations [that are] incorporated into and have become part of the contract at issue." *Wishneski v. Sielski*, No. HHDCV126029887S, 2016 WL 1038817, at *10 (Conn. Super. Ct. Feb. 11, 2016) (emphases omitted). Here, however, the plaintiffs have failed to identify any such misrepresentations by the defendants. As such, even if *Wishneski* represented the correct view of Connecticut law—a view in some doubt given *Macomber*, *Kane*, and *Musgrave*—, it would not move the dial for the plaintiffs.

relevant to this case is the prohibition of "[u]nfair claim settlement practices," in particular, "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Conn. Gen. Stat. § 38a-816(6)(F). Here, the plaintiffs allege that Amica "gave the insured a knowingly false and misleading reason for the denial of coverage." (Complaint at ¶ 77.) They allege that Amica has "regularly been engaged" in refusing to resolve such concrete decay claims in good faith, citing, for example, seven similar cases in Connecticut Superior Court in which Amica is a defendant. (*Id.* at ¶¶ 80-81.) The plaintiffs also allege that, through participation in the ISO, Amica had knowledge of many other concrete decay claims in northeastern Connecticut and the strategies used by insurers to deny those claims. (*Id.* at ¶¶ 75-76.) According to the amended complaint, Amica was part of "an insurance industry wide practice of denying coverage for concrete decay claims." (*Id.* at ¶ 78.)

Other courts have found similar allegations sufficient to sustain a CUIPA/CUTPA claim, concluding that where the insurer gave a knowingly false reason for denying coverage, it had failed to act in "good faith" under CUIPA. *See, e.g.*, *Gabriel v. Liberty Mut. Fire Ins. Co.*, No. 3:14-cv-01435-VAB, 2015 WL 5684063, at *5 (D. Conn. Sept. 28, 2015) ("The Gabriels allege that Liberty Mutual gave them a false and misleading reason for denying coverage by citing inapplicable policy language, and failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of their claim . . . . These allegations satisfy the requirements to allege that the defendant engaged in an act prohibited by CUIPA."); *Karas*, 33 F. Supp. 3d at 117 ("The Karases allege that Liberty Mutual gave them a knowingly false and misleading reason for the denial of coverage, and thus failed to attempt 'in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear,' which is

proscribed by CUIPA . . . . Therefore, the complaint states a plausible claim for violation of CUTPA.").

Amica contends that "[a]lleging and proving a 'general business practice' requires more than merely asserting the practice exists or citing other unrelated cases supposedly contending the same types of claims and alleging bad faith allegations." (ECF No. 41-1 at 34.) More is not required, however, as this stage of the litigation. *See Liston-Smith v. Csaa Fire & Cas. Ins. Co.*, No. 3:16-CV-00510 (JCH), 2016 WL 6246300, at *4 (D. Conn. Oct. 25, 2016) ("These repeated claims that [the defendant] is unfairly denying claims sufficiently allege a general business practice in violation of CUIPA to survive this Motion to Dismiss."). Further, the plaintiffs do not merely allege that Amica is the defendant in several other lawsuits involving the same conduct. They also allege that Amica participated in the ISO and, through such participation, took part in an insurance industry wide practice of denying claims based upon cracking concrete without a valid basis under the policies. (*See* Complaint at ¶¶ 75-78.) Such allegations also give rise to a plausible claim that Amica was engaged in a general business practice in violation of CUIPA. *See Liston-Smith*, 2016 WL 6246300 at *4.

Amica also argues that its denial of coverage for the plaintiffs' home cannot constitute a violation of CUIPA because "reasonable people could disagree" regarding whether the plaintiffs' claim was covered. (ECF No. 41-1 at 36.) Drawing all reasonable inferences in favor of the plaintiffs, and given that under one reasonable interpretation, Amica's rationale for denying the plaintiffs coverage was inapplicable, I cannot conclude on the basis of the pleadings and the incorporated policies that the plaintiffs' CUIPA/CUTPA claim fails. The plaintiffs have plausibly alleged that it was not in "good faith" to deny them coverage, particularly in light of

Amica's alleged knowledge of similar cases through its participation in the ISO.  As such, it remains to be determined whether Amica's actions violated CUIPA.

## V.       Conclusion

For the reasons stated above, Amica's motion to dismiss (ECF No. 45) is GRANTED IN PART AND DENIED IN PART.  It is granted with respect to the plaintiffs' breach of the implied covenant of good faith and fair dealing claim (count three) and declaratory judgment claim (count two).  It is denied with respect to the plaintiffs' other claims.


IT IS SO ORDERED.

                                                        _____/s/_____
                                                        Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                September 17, 2018